216 So.2d 314 (1968)
Alvin J. THIBODEAUX et ux., Plaintiffs-Appellants,
v.
AETNA CASUALTY AND SURETY COMPANY et al., Defendants-Appellees.
No. 2477.
Court of Appeal of Louisiana, Third Circuit.
December 5, 1968.
*315 Dennis Whalen, Baton Rouge, and William C. Bradley, Baker, for plaintiffs-appellants.
Gold, Hall & Syke, by Leo Gold, Alexandria, for defendants-appellees.
Before FRUGE, SAVOY, and MILLER, JJ.
FRUGE, Judge.
This is an action in tort by Alvin J. Thibodeaux and his wife, Mary Thibodeaux, against Dr. Daniel M. Kingsley, an orthopedic surgeon of Alexandria, Louisiana, and his insurer, Aetna Casualty and Surety Company.
On March 3, 1962, Mrs. Mary Thibodeaux, wife of Alvin J. Thibodeaux, was injured in Aloa, Louisiana, when she suffered a severe fracture of her ankle. She was taken to St. Francis Cabrini Hospital, Alexandria, Louisiana, and was seen and examined by Dr. Daniel M. Kingsley, the defendant in this matter. Dr. Kingsley attempted a closed reduction of the severe fracture of the ankle, and when it became apparent that this would not work, he did an open or operative reduction of the fracture. During this operation, it was necessary that certain bones be fixed together by the use of metallic screws. The operation was performed in one of the operating rooms at Cabrini Hospital with the usual sterile operating techniques. Three incisions were necessary, but each incision was closed with surgical stitches before the next was opened. All wounds were bandaged and a "long-leg cast" was applied. Three days later, because of slight swelling of Mrs. Thibodeaux's ankle and foot, it became necessary that the cast be split or "bi-valved", in order to relieve pressure. About that same time, Mrs. Thibodeaux developed a slight elevation of temperature and complained about a sore throat. Dr. Kingsley diagnosed her condition as "acute, follicular tonsillitis." Antibiotics were prescribed for her fever, and it went down after approximately three to four days of antibiotic therapy. For approximately four days thereafter, Mrs. Thibodeaux was relatively pain-free, and was taken off narcotic drugs which had previously been given for pain, after which period, Mrs. Thibodeaux again became slightly feverish, and requested and received narcotics for pain for the next few days.
In the period from March 10 through March 13, Mrs. Thibodeaux's temperature and respiration had been normal, circulation was noted to be good, and she was able to use a wheel chair. The nurse's notes of the date of March 13 described the patient as having had an improved eight hours. On the date of March 14, she had a regular diet breakfast and a bath, and was up in a wheel chair for thirty minutes after *316 breakfast, after which she returned to bed to reduce the swelling of her toes by elevation of the foot. At noon on March 14, her temperature was 100.2. She had rested in the late morning, and at 4:00 p. m. she was put back up in the wheel chair for thirty or forty minutes. By 8:00 p. m. her temperature was 100.6 but by midnight her temperature was down to 99.6, and she enjoyed some hot milk around 1:15 a. m., on the date of March 15.
During the elevation of temperature just referred to, Mrs. Thibodeaux's pulse did not rise. On the morning of March 15, at 8:00 a. m., her temperature was 99.0. She had a regular diet breakfast and visitors, and was up in a wheel chair for forty minutes after 9:00 a. m. At noon, her temperature was 100.4, her pulse and respiration were up, and her toes were swollen and feverish. The cast was immediately opened and infection was found. Dr. Kingsley would have operated immediately, but Mrs. Thibodeaux had just had lunch. Since the operation required a general anesthetic it was necessary that the operation be delayed to allow her time to digest her food. At 4:00 p. m., her temperature was 102.6°, temperature measures were instituted, and at 6:00 p. m., she was given pre-operative medication to prepare her for surgery. At 7:15 p. m. she was given a general anesthetic in the operating room, with the operation starting at 7:25 p. m. and ending at 8:45 p. m. At surgery, all three incisions were opened, pus was found and was sent to the laboratory for culture and drug sensitivities, and treatment consisting of irrigation with Chloromycetin was instituted.
As a result of the infection of her right ankle, Mrs. Thibodeaux was forced to undergo numerous expensive surgical procedures, skin grafts, and has now a series of scars on her left leg and a stiff or "fused" ankle, a result of the infection process in the ankle joint.
This suit was instituted by Mr. and Mrs. Thibodeaux against Dr. Kingsley and his insurer, charging negligence on the part of Dr. Kingsley in the treatment of Mrs. Thibodeaux. Following an adverse judgment, the plaintiffs have appealed to this court.
In their appeal, plaintiffs allege negligence on the part of Dr. Kingsley which would make him liable for the subsequent problems encountered by plaintiff. Basically, plaintiffs claim that Dr. Kingsley should have become aware of the infection at the operative site prior to the time that he did.
Although plaintiffs agree that "all of the experts agree with Dr. Kingsley that when to remove or window a cast was a question which addressed itself to the judgment of the treating physician", they allege error in the trial court's refusal to note what they have termed "a conspiracy of silence" on the part of the medical experts to protect a physician.
Plaintiffs offered no expert evidence to support any charge of negligence or misfeasance alleged by them. Plaintiffs' own witness, Dr. W. W. Washburn, in deposition, stated that he had carefully read the medical record and, "As soon as there was any change in the patient's course, she was operated on". This doctor pointed out that when the fever was about normal at 8:00 a. m. on March 15, and then that day went up, this is when he would suspect something.
Dr. T. E. Banks, Jr., an orthopedic surgeon of Alexandria, Louisiana, stated that he would not have considered opening the cast until after the noon recording on the date of March 15. Drs. Macpherson and Hardy expressed the same opinion, that is, that until the temperature became elevated and the pulse rapid after noon of March 15, they would not have opened the cast. All of these doctors, as well as Dr. Kingsley, explained with great logic why it is not good medical practice to open a cast without sound medical justification. The dangers that lie in store with this kind of investigation far out-weigh the satisfaction of curiosity.
*317 All of the doctors agreed that the decision of when to open a cast is based upon sound medical judgment of the treating physician and that the resolution of this problem is necessarily influenced by many factors. In this case, the overall condition of the patient was good until March 15, 1962. All of the medical signs indicated that she was doing well up until this point. All of the doctors agree that Dr. Kingsley had opened the cast at the very earliest point that such a decision appeared to be in order, and that he thereupon immediately instituted sound and proper medical treatment for the resolution of this condition.
The plaintiffs in this case have failed to produce medical testimony, even that of their own experts, to support their contention of negligence on the part of Dr. Kingsley. An extensive and exhausting cross-examination of Dr. Kingsley was conducted which established no misfeasance or departure from the standards of practice in his community on the part of Dr. Kingsley. The record abounds with evidence of his skill and qualifications, and the testimony of the well-qualified experts, without exception, supports the fact that the treatment that was rendered by Dr. Kingsley was proper and correct in every respect and in full conformity with the standards of practice in the City of Alexandria as well as elsewhere.
In addition to plaintiff's basic complaint discussed hereinabove, although plaintiff did not strenuously argue these points, much evidence was introduced to intimate that Dr. Kingsley was negligent in the manner in which he treated Mrs. Thibodeaux's sore throat, in that (1) he diagnosed her condition as "acute follicular tonsillitis", whereas, in fact, her tonsils had been removed by a Board qualified surgeon eight years before, and (2) Dr. Kingsley should have had a culture made of the bacteria from the infected area.
Each physician who testified on these questions specifically agreed with Dr. Kingsley's diagnosis. These doctors made it abundantly clear that even after tonsils are "cleanly" removed, the same area can become swollen and infected and give the appearance to justify this diagnosis. As to the culture of the throat bacteria, all physicians agreed that a culture was not indicated. Indeed, Mrs. Thibodeaux had completely recovered from the throat infection prior to the time the culture could have yielded any information.
The failure of plaintiffs to produce any evidence or testimony which would prove the negligence of Dr. Kingsley was fatal to their cause. As to the allegation of a conspiracy of silence, this court can do naught but consider the record as it is, and in this record we find no evidence of such conspiracy.
The general malpractice law of the State of Louisiana was stated by the Supreme Court in the case of Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953), and is as follows:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule, it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case."
See also Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100 (1966).
This law has been uniformly followed by the courts of this State and by the federal courts dealing with Louisiana cases, which cases are too numerous to name.
It is obvious after a reading of the voluminous record of this case, that Dr. Kingsley did follow the general and approved medical practices of his community *318 and of the medical profession in treating Mrs. Thibodeaux.
For the foregoing reasons, the judgment of the lower court in favor of defendants is affirmed, costs to be paid by plaintiffs-appellants.
Affirmed.